### KANSAS CITY, M. & O. RY. Co. et al. v. COSTA.

No. 6708—Opinion Filed Feb. 5, 1918.

(170 Pac. 892.)

1. **Negligence—Federal Employers' Liabili-ty Act—Contributory Negligence—Dam-ages.**

The requirement of federal Employers' Li-ability Act April 22, 1908, c. 149, 35 Stat. 65 (U. S. Comp. St. 1916 secs. 8657-8665), that diminution of damages by the jury in case of an employe's contributory negli-gence shall be in proportion to the amount of negligence attributable to such employe. means that where the causal negligence is attributable partly to the carrier and partly to the employe, recovery cannot be had for full damages, "but only for a diminished sum bearing the same relation to the full damages that the negligence attributable to the carrier bears to the negligence attribut-able to both; the purpose being to ex-clude from recovery a proportional part of the damages corresponding to the employe's contribution to the total negligence."

**2. Master and Servant—Injuries to Servant—Federal Employers' Liability Act —Assumption of Risk.**

"It is error to instruct a jury, in an action for damages for personal injuries, that a servant does not assume such risks as are created by the master's negligence. The true rule in this regard is that the servant assumes all the ordinary risks of his employment which are known to him, or which could have been known with the exercise of ordinary care to a person of reasonable prudence and diligence, under like circumstances; and with reference to risks not naturally incident to the occupation, but which may arise out of the failure of the master to exercise due care in the performance of some duty owing by him to the servant, the rule is that the servant does not assume such risks until he becomes aware of such negligence of the master and of the risks so arising therefrom, unless the defect and risk are so apparent and obvious that an ordinarily careful person would observe the one and appreciate the other."

(Syllabus by Bleakmore, C.)

Error from District Court, Major County; James W. Steen, Judge.

Action by Lula Costa, administratrix of the estate of Burley D. Costa, deceased, against the Kansas City, Mexico & Orient Railway Company and J. O. Davidson and others, receivers. Judgment for plaintiff, and defendants bring error. Reversed, and cause remanded for a new trial.

Jno. A. Eaton, Dudley W. Eaton, Hyden J. Eaton, and F. W. Fischer, for plaintiffs in error.

John V. Roberts and Garber & Kruse, for defendant in error.

Opinion by BLEAKMORE, C. This is an action under the federal Employers' Liability Act (35 Stat. at L. 65, c. 149, Comp. Stat. 1916, §§ 8657-8665), commenced in the trial court by Lula Costa, administratrix of the estate of Burley D. Costa, as plaintiff, against the Kansas City, Mexico & Orient Railway Company, a corporation, J. O. Davidson, E. Dickinson, and M. L. Turner, receivers, as defendants, seeking recovery on account of the death of her intestate, alleged to have resulted from the negligence of defendants while employed by them. There was a judgment for plaintiff, and defendants have appealed. The parties are referred to as they appeared below.

Defendants were operating a line of railway in interstate commerce, and the deceased, Costa, was one of their employes when, on June 21, 1912, he suffered injuries resulting in his death. As to his employment and the circumstances of the occurrence of the injury occasioning his

death, the evidence shows that from June 7 to June 12, 1922, defendants were engaged in burning the vegetation along their right of way from Wichita, Kan., to a point about a mile north of Cherokee, Okla., using a car equipped for that purpose known as a "weed burner," which with an engine and other cars composed a work train, in charge of a conductor. J. D. Brunk, defendants' roadmaster, also accompanied the train. Deceased was employed in the operation of the weed burner, which is described by the conductor as follows:

"It is an iron-bodied car, set upon two pairs of wheels, length of body approximately 17 or 18 feet; on each side of the car and in front, what we call the front end, and level with the floor of the car, was situated two reservoirs, and, one on the front end, for the purpose of holding gasoline, and I believe they contained three barrels each. On the rear end of the car where the burner was located— the burner was constructed of cast iron; the main portion was attached rigidly to the frame. There were two wings, one on each side, that could be raised and lowered in order to pass by obstructions such as cattle guards and such obstructions along the tracks. The wings were operated by means of air pressure from the engine. The wings to the burner contained coils about 1 1-2 or 1 1-4 inch gas pipe that were perforated. The coils were underneath the burner and the wings. On top of the burner were other pipes connected with the coils underneath, and in those pipes were holes 6 or 8 inches apart, through which the gas, after being generated into gas, the flame was forced down by air pressure on the weeds and that destroyed them. I believe that is a general description. Q. How were these wings raised and lowered when the air from the engine was not used? A. Well, it was very difficult. There was an upright staff with a wheel on top something like a brake wheel and a ratchet at the bottom connected with a coil of wire rope that wound around that was supposed to lower and raise the wings, but it was difficult to do that; the wing had to be assisted from the outside: the weight of the wing was too great. Q. What was the weight of the wing in your best judgment? A. I am not prepared to say. The wing was cast iron and possibly might weigh 350 or 400 pounds, maybe more. Q. When they were being operated, how close to the ground were they carried? A. Well, they were set so as to clear the main bridles or switches and connecting side tracks: it was the expectation that they would clear obstructions of that height. Q. How far would you say they would be carried above the ends of the cross-ties? A. Six or 7 inches was the general position, and there was sometimes when they were elevated a little higher. Q. Wasn't it possible for one man to raise one of these

wings by use of this wheel, of this rachet, or would he have to have assistance from some one on the ground lifting on the wings? A. A strong man with a club might do it. Q. That is, to put a club inside of the pully and pull it? A. Yes, sir. O Did you ever see one man do that? A. I don't believe I ever have."

On the day Costa met his death the work train in question was run upon a side track at Cherokee to permit the passing of a passenger train, and while on the side track the tanks on the weed burner were filled with gasoline, the engine and other cars were coupled to it, forming a train with the weed burner at the front or north end, it being the purpose to return and resume destroying the vegetation at the point where that operation had been interrupted. During this period of stoppage the left or west wing of the weed burner was lowered, and Costa was engaged in making some minor repairs or adjustments thereof. No one connected with the operation of the train seems to have observed whether this wing was raised after Costa completed his work. The conductor further testified:

"Q. Did you make any inquiry whether or not they were ready to move? A. When I came up there from the depot with the orders, the engineer was sitting in the door of the caboose, and the head brakeman and Mr. Brunk were working around the burner: they were handling the hose that we used to tap the oil from the tank car into the reservoirs, and they were two or three car lengths away, and I halloed and asked them how they were fixed, and answer was made by Mr. Brunk that they were ready or would be ready shortly. Q. Then you pulled out? No; I gave the orders to engineer Trumbo and went into the caboose; I had bought the home paper, and I went into the caboose, as my help was not needed, and read the newspaper. Mr. Trumbo left the caboose immediately upon that information and got on the engine, and within a few minutes— I don't know how long— they coupled up and started off. Q. Do you know who was on the weed burner at the time after you moved out up until the time of the derailment? A. I don't know of my own knowledge: I only know what I was told. Q. Who was in the caboose with you, if you remember? A. Well, the rear brakeman rode to the depot and got off to go to town to buy some supplies for the commisary department; after that time I was alone until the accident happened. Q. Do you know where the head brakeman was? A. I only have his statement; I don't know of my own knowledge."

The train was started, Costa and the roadmaster riding on the weed burner, and after it had proceeded north some 1,500 or 2,000 feet, the burner was derailed, and gasoline which was thrown over Costa was ignited, burning him to such an extent that he died shortly thereafter.

The roadmaster also testified:

"Q. You may state, Mr. Brunk, whether or not the wings on the weed burner were down when you got on the weed burner. A. I don't know. Q. Well, didn't you observe? A. No; I wasn't in a position to see but only one wing, and it was up. Q. Well, you could see whether the wings were up or down when you were on the weed burner? A. I didn't; I could have. Q. Was there anything to obstruct your view standing on the weed burner when you started out? A. No sir. Q. Was there anything to obstruct the view of the fireman or engineer working east toward the weed burner? A. No, sir. Q. That clear view remained clear all the way until the time of the derailment? A. Yes, sir. Q. And it remained on beyond that point? A. Yes, sir. Q. What were you doing at the time of the derailment? A. I don't remember. Q. What was Costa doing? A. I don't remember that I don't remember a thing that was going on after we left the switch."

At the close of the evidence on behalf of plaintiff, defendants interposed a demurrer thereto, which was overruled, and at the conclusion of all the evidence defendants moved for a directed verdict, which motion was likewise overruled. The action of the court in this regard is assigned as error, it being insisted that the evidence adduced was insufficient to take the case to the jury. Again, it is urged in the briefs that the deceased, Burley D. Costa, was not engaged in interstate commerce at the time of his injury, and therefore the action is not maintainable under the federal Employers' Liability Act. On oral argument the latter contention was abandoned.

It is further contended that the injuries suffered by plaintiff's intestate resulting in his death were due solely to his own negligence, which consisted in his failure to raise the wing of the weed burner by means of one of the devices provided therefor; that there was no primary negligence shown on the part of defendant, and, inasmuch as the liability imposed by the provisions of the federal Employers' Liability Act is conditioned on the negligence of the carrier, no recovery can be had.

One of the allegations of the petition is that the train was negligently started when a wing of the weed burner was down and

in such position as to strike the protruding surface of the ground or any obstruction on the right of way. The evidence tends to establish, as contended by defendants, that the wing of the weed burner. lowered by Costa, and which was permitted to remain in that position, did strike upon the right of way, with the consequent derailment and injuries produciec his death; but the un-controverted evidence also shows that there was a clear and unobstructed view of the weed burner and of the right of way for some 1.500 or 2,000 yards from the place of starting to the point of derailment, and that neither the engineer ,fireman, brake-man. roadmaster, nor conductor even looked to ascertain whether the wings were in su b position to render the weed burner unsafe when set in motion. In fact, for some minutes before and at the time when the train was started, the conductor in charge who gave the orders for its movement was engrossed in a newspaper and oblivious of all else.

It is conceded that Costa's death was caused by negligence. If it resulted in whole or in part from the negligence of their employes, defendants are liable. We are of opinion that the jury might reasonably have concluded from the evidence that such causal negligence was attributable partly to Costa and partly to the employes of defendants.

By virtue of the federal Employers' Liability Act (which. where applicable, super-sedes all state laws on the subject), in ac-tions to recover damages for personal in-juries to an employe; or where such in-juries have resulted in: his death, the fact that the employe may have been guilty of contributory negligence does not bar re-covery, but the damages must be diminished by the jury in proportion to the amount of negligence attributable to such employe. Obviously on the theory that the jury might reasonably find from the evidence that the injuries resulting in the death of Costa were caused by the concurring negligence of defendants and himself, the court in-structed relative to the diminution of dam-ages as follows:

"The jury are instructed that if you find from the evidence that Burley D. Costa was guilty of contributory negligence re-sulting in injuries causing his death, yet that fact will not bar a recovery by the plaintiff in this case, but the damages must be diminished by the jury in proportion to the amount of negligence attributable to the said Burley D. Costa.

"You are instructed that it was the duty of Burley D. Costa to exercise reasonable care for his own safety and protection

while in the discharge of his duties in the employ of the defendants, and if you find from the evidence that he failed to exercise such care and that his failure to do so was the direct and proximate cause of the in-juries resulting in his death, without neg-ligence contributed thereto on the part of the defendants, their agents and employes, then the plaintiff would not be entitled to recover in this action, and you should find for the defendants. If, however, you find that the defendants, their agents or em-ployes, were negligent as charged in plain-t ff's petition, and that the deceased, Burley D. Costa, was also negligent, and that his negligence contributed to his injuries and death, such negligence on his part would not bar plaintiff's right to recover herein, but the damages which you find from the evi-dence plaintiff is entitled to shou.d be di-minished by you in your verdict in propor-tion to the amount of negligence which you find from the evidence is attributable to the deceased."

Construing the provision of section 3 of the federal Employers' Liability Act (U. S. Comp. St. 1916, § 8659), declaring:

"The fact that the employe may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employe"

—the Supreme Court of the United States. in Seaboard Air Line Ry. Co. v. Tilghman. 237 U. S. 499, 35 Sup. Ct. 653, 59 L. Ed. 1069, stated:

"It means, and can only mean, as this court has held, that, where the causal neg-ligence is attributable partly to the carrier and partly to the injured employe, he shall not recover full damages, but only a dimin-ished sum bearing the same relation to the full damages that the negligence attributable to the carrier bears to the negligence attrib-utable to both; the purpose being to ex-clude from the recovery a proportional part of the damages corresponding to the em-ploye's contribution to the total netgligence, Norfolk & W. R. Co. v. Earnest, 229 U. S. 114, 122, 57 L. Ed. 1096, 1101, 33 Sup. Ct. Rep. 654, Ann. Cas. 1914C. 172; Grand Trunk Western Ry. Co. v. Lindsay, 233 U. S. 42, 49, 58 L. Ed. 838, 842. 34 Sup. Ct. Rep. 581. Ann. Cas. 1914C 168."

The italicized portion of the instruc-tions to which exception is taken is substan-tially in the language of the statute, and in our opinion the rights of defendants were in no way prejudiced thereby.

One of the elements of the negligence re-lied upon by plaintiff at the trial was al-leged defects and insufficiencies in the weed burner. As to this feature of the case de-fendants pleaded and sought to establish

that if such conditions existed, Costa was fully advised thereof, and assumed all risks Incident thereto. Upon the question thus presented the court instructed the jury:

"* * * The servant does not assume the risk of being injured by his master's negligence, and the master's negligence is not recognized as a risk incident to the servant's employment. The risks which the servant assumes are all those risks ordinarily incident to the employment and such as are liable to arise from defects which are patent and obvious to a person of his experience and understanding, but not such risks as may be due to the failure of the master to exercise reasonable care and prudence. In other words, the risks the servant assumes are only such risks as remain incident to the employment after the master has exercised reasonable care to provide reasonably safe instrumentalities in the way of machinery and appliances, and reasonably competent fellow servants who will exercise reasonable care in the performance of their duties, and a reasonably safe place for the servant to perform the work he is hired to do."

Defendant complains, and we think rightly, that such charge involves a misstatement of the doctrine of assumption of risk. The correct rule, applicable in the instant case, is announced, and the federal and state authorities collated, in the well-considered opinion in C., R. I. & P. Ry. Co. v. Hughes, 64 Okla. 74, 166 Pac. 411, as follows:

"It is error to instruct a jury in an action for damages for personal injuries that a servant does not assume such risks as are created by the master's negligence. The true rule in this regard is that the servant assumes all the ordinary risks of his employment which are known to him, or which could have been known with the exercise of ordinary care to a person of reasonable prudence and diligence, under like circumstances; and with reference to risks not naturally incident to the occupation, but which may arise out of the failure of the master to exercise due care in the performance of some duty owing by him to the servant, the rule is that the servant does not assume such risks until he becomes aware of such negligence of the master and of the risks arising therefrom, unless the defect and risk are so apparent and obvious that an ordinarily careful person would observe the one and appreciate the other."

On account of the error in charging the jury as above set forth, the judgment should be reversed, and the cause remanded for a new trial.

By the Court: It is so ordered.